IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| IN RE: | : | |
| | : | |
| VCW ENTERPRISES, INC. d/b/a M&W PRECAST, f/k/a MODERN PRECAST CONCRETE, INC. | : | CIVIL ACTION |
| | : | |
| | : | No. 14-4705 |
| | : | |
| | : | |
| UNITED CONCRETE PRODUCTS | : | BANKRUPTCY |
| | : | |
| Appellant/Defendant, | : | No. 13-00224 |
| | : | |
| v. | : | |
| | : | |
| VCW ENTERPRISES, INC. d/b/a M&W PRECAST, f/k/a MODERN PRECAST CONCRETE, INC. | : | |
| | : | |
| | : | |
| Appellee/Plaintiff. | : | |
| | : | |

**<u>MEMORANDUM</u>**

**Juan R. Sánchez, J.**                                                    **January 15, 2015**

Appellant United Concrete Products, Inc. (United) appeals from a June 23, 2014, Order and Judgment of the Bankruptcy Court in the amount of $95,409.70. This amount represents the combined total of one pre-petition payment of $6,827.58 and two post-petition payments totaling $88,582.12 made by Appellee VCW Enterprises, Inc. (Debtor) to United. In its appeal, United argues the pre-petition transfer was not avoidable and the post-petition transfers were authorized by the Bankruptcy Court in the bankruptcy proceeding underlying this action. The Court addresses these specific issues on appeal: (1) whether the pre-petition transfer was avoidable pursuant to 11 U.S.C. § 547(b)(5); (2) whether the pre-petition transfer was made within the ordinary course of business, rendering it unavoidable pursuant to 11 U.S.C. § 547(c)(2); and (3)

whether the two post-petition transfers were authorized by the Bankruptcy Court's Customer Programs Order.[1]

**BACKGROUND**

This dispute arises out of a Chester County Solid Waste Authority (CCSWA) construction project to expand Area E of the Lanchester Landfill. The project was bonded through CCSWA. Debtor is a manufacturer and supplier of precast concrete structures, pipes, and related products. On August 23, 2012, Kinsley Construction, Inc., a general contractor on the project, hired Modern Precast Concrete (now Debtor) as a subcontractor. Debtor then hired United as a supplier. Prior to the petition date of December 6, 2012 (the day Debtor filed for protection under chapter 11), all products purchased by Debtor from United were delivered to Debtor. As of October 31, 2012, Debtor was overdue in its payment obligations to United by $95,409.70. Between October 25 and October 31, 2012, the parties discussed entering into a joint check agreement to ensure United would be paid for its already overdue invoices. On October 31, 2012, United threatened via email to repossess products it had delivered to Debtor but which had not yet been shipped to Kinsley if a joint check agreement was not signed. United also began seeking payment on the construction bond for the unpaid debts.

Between November 5 and November 10, 2012, Kinsley, Debtor, and United entered into a Joint Check Agreement (the Agreement) dated October 31, 2012. The Agreement allowed Debtor to submit invoices it received from United to Kinsley. Kinsley would then pay these invoices by negotiable check to United and Debtor in an amount not to exceed $95,409.70.

---

[1] Order Pursuant to 11 U.S.C. §§ 105(a), 363(b) and 503(b) Authorizing the Debtors Honor Prepetition Obligations to Customers and Otherwise Continue Customer Programs in the Ordinary Course of Business, and for Other Relief Related Thereto, *In re Modern Precast Concrete, Inc., et al.*, No. 12-21304 (Bankr. E.D. Pa. Dec. 12, 2012) [hereinafter Customer Programs Order].

Although the checks would be made to both Debtor and United, the Agreement stipulated that Debtor would hold the checks in trust for the benefit of United. The Agreement further set forth that, in the event of death, dissolution, liquidation, insolvency, business failure, default, or filing of bankruptcy petition by Debtor, Kinsley could, in its sole discretion, pay United directly for all unpaid invoices related to the project. United received three payments by joint check from Kinsley in execution of the Joint Check Agreement: $6,827.58 on November 26, 2012 (pre-petition), $63,996.49 on December 12, 2012 (post-petition), and $24,585.63 on December 31, 2012 (post-petition).

On December 6, 2012, Debtor filed for protection under chapter 11. Debtor asserts that as of the petition date, it was substantially under water with its primary secured lender, M&T Bank. Debtor also filed a Motion for Customer Programs Order,[2] which was granted by the Bankruptcy Court. Debtor's purpose in requesting the Customer Programs Order was to allow it to continue to fill orders and avoid having to list hundreds of one-time orders on its bankruptcy schedule.

During the course of its bankruptcy case, Debtor sold its Easton facility to Oldcastle Precast, Inc., and included the accounts receivables (A/R) on Debtor's books, for which Oldcastle paid a specified percentage. After the closing of the sale to Oldcastle, Debtor was informed by Oldcastle that it was unable to collect the Kinsley A/R because Kinsley had already satisfied its obligation to Debtor by making payments directly to United pursuant to the Joint Check Agreement. Oldcastle demanded a refund from Debtor for the amount it paid for the Kinsley A/R. On April 9, 2013, Debtor filed in the Bankruptcy Court a Motion for an Order

---

[2] Motion for an Order Pursuant to 11 U.S.C. §§ 105(a), 363(b) and 503(b) Authorizing the Debtors to Honor Prepetition Obligations to Customers and Otherwise Continue Customer Programs in the Ordinary Course of Business, and for Other Relief Related Thereto, *In re Modern Precast Concrete, Inc., et al.*, No. 12-21304 (Bankr. E.D. Pa. Dec. 6, 2012) [hereinafter Motion for Customer Programs Order].

Approving Settlement Agreement with Oldcastle Precast, Inc. Regarding Accounts Receivable of Kinsley Constructing, Inc. Under this settlement agreement, Debtor was required to file an action seeking to avoid the Joint Check Agreement and pursue avoidance recovery against United to recoup the money Kinsley directly paid to United. Any proceeds it collected from United were only to be used to pay either professional fees or Oldcastle.

On April 24, 2013, Debtor commenced an adversary proceeding in Bankruptcy Court against United, which is the subject of this action, as contemplated by the Oldcastle settlement agreement. A trial was held on May 19, 2014, and on June 23, 2014, the Bankruptcy Court entered judgment against United and in favor of Debtor in the amount of $95,409.70. Specifically, the Bankruptcy Court directed the recovery of a preferential pre-petition transfer of $6,827.58, pursuant to 11 U.S.C. § 547(b), and two unauthorized post-petition transfers of $63,996.49 and $24,585.63, pursuant to 11 U.S.C. § 549. On August 27, 2014, United appealed.

**DISCUSSION**

In reviewing a decision from a bankruptcy court, district courts evaluate factual findings for clear error, but subject legal conclusions to plenary review. *See, e.g.*, *In re Sharon Steel Corp.*, 871 F.2d 1217, 1223 (3d Cir. 1989). As to the factual findings, "[a] finding is 'clearly erroneous' when although there is evidence to support it, the reviewing [body] on the entire evidence is left with the definite and firm conviction that a mistake has been committed." *Concrete Pipe & Products of Ca., Inc. v. Constr. Laborers Pension Trust for S. Ca.*, 508 U.S. 602, 622 (1993) (alteration in original) (quoting *United States v. U.S. Gypsum Co.*, 333 U.S. 364, 395 (1948)). A bankruptcy court's conclusions of law, however, are considered de novo by the reviewing court. *See In re Int'l Wireless Commc'ns Holdings, Inc.*, 279 B.R. 463, 466 (D. Del.

2002), *aff'd*, 68 F. App'x 275 (3d Cir. 2003); *see also United States v. Roberts*, 552 F. App'x 136, 138 (3d Cir. 2014) (explaining "de novo" is also known as plenary review).

### A.  Issue One: Pre-petition Transfer as an Avoidable Preference Payment

The first issue on appeal is whether the $6,827.58 pre-petition transfer is an avoidable preference payment. A transfer is avoidable if the creditor receives more than it would receive if "(A) the case were a case under chapter 7 of this title; (B) the transfer had not been made; and (C) such creditor received payment of such debt to the extent provided by the provisions of this title." 11 U.S.C. § 547(b)(5). The parties disagree on whether the relevant comparison amount (the amount a creditor would have received if the hypothetical situation described in subsections (A), (B), and (C) occurred) is calculated solely from liquidation of the debtor's estate in a chapter 7 proceeding or if it can include what the creditor might have recovered from some other source outside of the estate. United asserts the comparison value can include payment from alternative sources, and had the pre-petition transfer not been made, it would have recovered the amounts it was owed by making a claim on the construction bond or by filing a mechanics' lien; therefore, it did not receive more from Kinsley's direct payments than it would have had this case been a case under chapter 7.[3]

---

[3] United argues that under the Pennsylvania Mechanics' Lien Law of 1963, 49 Pa. Cons. Stat. Ann. § 1101, et seq., United was a subcontractor and therefore, received a mechanics' lien on the date it furnished material to Debtor. The Mechanics' Lien Law provides that "every improvement and the estate or title of the owner in the property shall be subject to a lien . . . for the payment of all debts due by the owner to the contractor or by the contractor to any of his subcontractors for labor or materials furnished in the erection or construction." *Id.* § 1301(a). United admits it never actually filed for a mechanics' lien, but argues the fact that this statutory lien was "fixed" (but not perfected) means United could have collected on it in the event it was not paid.

Debtor disputes that United could have collected on a lien that was not perfected. Debtor also asserts that in the case below United abandoned its argument that it had a mechanics' lien and cannot now raise it on appeal. Because the Court finds the construction bond and any statutory mechanics' lien are alternative forms of payment from funds or property outside of

The Court agrees with the Bankruptcy Court's holding, and finds that the value of the hypothetical payment under § 547(d)(5) is based on what the transferee could have recovered from the Debtor's estate only. The point of the statute is to ensure creditors receive their fair share of the estate in the event of a bankruptcy. This finding is most consistent with case law and the language of the statute. The statute explicitly states that the relevant inquiry is what the creditor would have received "*to the extent provided by the provisions of this title*." 11 U.S.C. § 547(b)(5)(C) (emphasis added). During oral argument, United argued that collection from an outside source is not disallowed by Title 11, and therefore is provided by the provisions of that Title.[4] The statute is clear, however, and "provisions of this title" means that which is expressly dealt with in Title 11. Because Title 11 deals only with a debtor's estate, the comparison value does not include alternative sources of payment like a surety bond or mechanics' lien on a third party's property.

Other courts agree with this reading of § 547(b)(5). "[T]he relevant inquiry focuses 'not on whether a creditor may have recovered all of the monies owed by the debtor *from any source whatsoever*,' but instead on whether the creditor would have recovered 100% of the debt from the debtor's estate." *In re N.A. Flash Found. Inc.*, 298 F. App'x 355, 359 (5th Cir. 2008) (alteration in original) (quoting *In re Virginia-Carolina Fin. Corp.*, 954 F.2d 193, 199 (4th Cir. 1992)); *see also In re J.A. Jones, Inc.*, 361 B.R. 94, 101 (Bankr. W.D.N.C. 2007) (explaining that the "focus of the preference statutes is on the effect of a transfer on the debtor, not on the

Debtor's estate and that alternative sources of payment are not included in the analysis under 11 U.S.C. § 547(b)(5), it need not decide whether the lien had to be perfected in order for United to collect on it and or whether United abandoned its argument. Therefore, the Court will include the statutory lien in its analysis, even if not fully considered below.

[4] At the oral argument, United admitted that any mechanics' lien would not be on the property of Debtor, but on the property of the construction project. Therefore, the lien is an alternative source of payment and not part of Debtor's estate.

transferee," and therefore, "parties holding liens on third party property (but not that of the debtor) [are] unsecured creditors" not shielded by § 547(b)(5) from preference attack); *In re Pameco Corp.*, 356 B.R. 327, 336 (Bankr. S.D.N.Y. 2006) ("[A] prepetition transfer to a creditor that is fully secured by property of a third party in which the debtor holds no interest is subject to avoidance and does not come within the § 547(b)(5) exception.").[5] The Bankruptcy Court found that the general unsecured creditors' claims totaled almost $9 million but in a chapter 7 liquidation, those creditors would have received a total distribution of only about $700,000. Therefore, by receiving full payment on Debtor's debts, United received more than it would have from Debtor's estate if this case were one under chapter 7 and the transfer had never been made. The Court will affirm the Bankruptcy Court's holding that the pre-petition transfer is an avoidable preference payment.

## B. Issue Two: Ordinary Course of Business

Alternatively, United argues the pre-petition transfer falls into an exception to 11 U.S.C. § 547(b)(5), which states "[t]he trustee may not avoid under this section a transfer . . . to the extent that such transfer was in payment of a debt incurred by the debtor in the ordinary course of business or financial affairs of the debtor and the transferee, and such transfer was—(A) made in the ordinary course of business or financial affairs of the debtor and the transferee; or (B) made according to ordinary business terms." 11 U.S.C. § 547(c)(2). Subsection (A) is a

---

[5] The Bankruptcy Court cited to three cases as supporting United's argument that a court could consider alternative sources outside of the debtor's estate. Two of those cases involved statutory mechanics' liens, and, although not explicitly stated, it appears those liens were on the debtors' properties and not the properties of third parties. *See In re The Electron Corp.*, 336 B.R. 809, 812-13 (B.A.P. 10th Cir. 2006); *In re 360Networks (USA), Inc.*, 327 B.R. 187, 193 (Bankr. S.D.N.Y. 2005). In this case, any mechanics' lien would have been on the construction project, and not Debtor's estate. In the third case cited by the Bankruptcy Court, the third party holding the bond at issue had a security interest in the debtor's estate. *See In re ML & Assoc, Inc.*, 301 B.R. 195, 202-03 (Bankr. N.D. Tex. 2003). That bond is not analogous to the construction bond in this case, which is attached to the construction project and not Debtor's estate.

subjective test and the court must determine whether the transaction was an ordinary transaction between the two parties. Subsection (B), on the other hand, is an objective test that determines if the transaction is ordinary for the industry. *See In re NWL Holdings, Inc.*, No. 08-12847, 2013 WL 2436667, at *7 (Bankr. D. Del. June 4, 2013) (citations omitted).

As to subsection (A), the subjective test, the following factors are relevant to whether the transfers were within the ordinary course of business between a plaintiff and a defendant: "(1) the length of time the parties have engaged in the type of dealing at issue; (2) whether the subject transfer was in an amount more than usually paid; (3) whether the payments were tendered in a manner different from previous payments; (4) whether there appears any unusual action by either the debtor or creditor to collect or pay on the debt; (5) whether the creditor did anything to gain an advantage (such as gain additional security) in light of the debtor's deteriorating financial condition." *In re Pure Weight Loss, Inc.*, 446 B.R. 197, 205 (Bankr. E.D. Pa. 2009) (citations omitted). The relevant inquiry under (B), the objective test, is whether the transfer is "in line with the industry norm." *In re NWL Holdings, Inc.*, No. 08-12847, 2013 WL 2436667, at *7 (Bankr. D. Del. June 4, 2013). "'[O]rdinary business terms' refers to the *range* of terms that encompasses the practices in which firms similar in some general way to the creditor in question engage, and that only dealings so idiosyncratic as to fall outside that broad range should be deemed extraordinary and therefore outside the scope of subsection C." *In re Molded Acoustical Products, Inc.*, 18 F.3d 217, 224 (3d Cir. 1994) (citation omitted).

The Bankruptcy Court concluded, and this Court agrees, United failed to prove that the pre-petition transfer was made either in the ordinary course of business between the two parties or according to ordinary business terms in the industry, and therefore the exception to § 547(d)(5) does not apply. Because the parties only recently began doing business together,

there are no transactions with which to compare the pre-petition transfer and the Court must focus on the last two factors of the subjective test involving unusual activity or strategic behavior. The Bankruptcy Court found that by pursuing its bond claim and later agreeing to the joint check arrangement, United took unusual action both to collect the debt and to protect itself from Debtor's deteriorating financial condition. As Debtor points out, United invoiced Debtor regularly during the project from August through September 2012, and each such invoice was a separate payment obligation with full payment expected within thirty days. After the parties signed the Joint Check Agreement in November 2012, the entire debt was paid within a little over a month by way of three payments varying in amount, representing a quick, full pay-off that was not ordinary business between the parties. The Court agrees that formation of the Joint Check Agreement is unusual activity by the parties to collect or pay the debt, and is a strategic action by United to gain an advantage in light of Debtor's poor financial situation. As to the objective prong, the Bankruptcy Court found that United presented no evidence as to what is ordinary in the industry and thus did not establish that the pre-petition transfer was made according to ordinary business terms in the industry. Based on the evidence presented below,[6] the Court agrees that United has not shown the transfers made pursuant to the Joint Check Agreement were ordinary in the industry. The Court will affirm the Bankruptcy Court's holding as to this issue.[7]

---

[6] The Bankruptcy Court found that Debtor had entered into two or three joint check agreements in the past. United had entered into at least seven joint check agreements in the past five years. Jonathon Gavin, President of United, testified at trial that of these seven joint check agreements, half were put in place prior to the start of the project. The other half were arranged after the project had commenced.

[7] At the oral argument, the parties disagreed whether this issue was a question of fact, requiring review for clear error, or an issue of law, requiring plenary review. This Court finds, however,

### C.  Issue Three: Customer Programs Order

United asserts the two post-petition transfers were authorized by a Customer Programs Order the Bankruptcy Court entered on December 12, 2012, in the underlying bankruptcy proceeding. The Bankruptcy Court held the post-petition transfers were not authorized by that Order, and thus were avoidable under 11 U.S.C. § 549(a), which states "the trustee may avoid a transfer of property of the estate . . . that occurs after the commencement of the case; and . . . that is not authorized under this title or by the court." 11 U.S.C. § 549(a).

The Customer Programs Order was entered in response to Debtor's motion and authorized Debtor to honor all pre-petition obligations related to Customer Programs. Debtor's motion defined Customer Programs as orders Debtor accepted for the sale of various materials and products, and the services performed for customers relating to the fulfillment of those orders. As of the Petition Date, several purchase orders were in process, and Debtor, through the motion, sought permission to fulfill these orders.

United argues that Debtor fulfilled customers' purchase orders by paying United for various materials and products, and because the Customer Programs Order authorized transfer of property related to the fulfilment of those orders, the post-petition transfers were authorized by the Customer Programs Order and cannot be avoided. United also points out Debtor's Executive Vice President authorized each post-petition payment to United.[8]

---

even under de novo review, United has not established that a joint check agreement is standard in the industry.

[8]  In response to United's claim that Debtor's Vice President authorized the post-petition payments, Debtor asserts the fact that the Vice President approved the post-petition transfers is not evidence of Bankruptcy Court approval. This Court agrees. In addition, the email between Debtor's Vice President to United's President authorizing the post-petition transfers was sent on December 12, 2012, several hours before the hearing on the Customer Programs Motion, and

The Bankruptcy Court found, based on the language of Debtor's motion and the testimony of Debtor's Chief Financial Officer during the trial, that the point of the Customer Programs Order was to fulfill purchase orders accepted by Debtor prior to the commencement of the bankruptcy case, thereby ensuring Debtor could continue to fill and ship those orders to its customers. The post-petition transfers were not for purchase orders accepted by Debtor for the sale of materials or products by Debtor. Because the two post-petition transfers to United were made to satisfy the balance of a pre-petition debt for the pre-petition purchase of concrete products, they were not authorized by the Customer Programs Order. This Court agrees with the Bankruptcy Court and notes the Bankruptcy Court Judge who issued the Customer Programs Order after a hearing on the motion also presided over the adversary proceeding, and is thus perhaps the best source for determining which transactions were covered by his Order. Given the language of the motion underlying the Order and the Judge's interpretation of his own words, this Court will affirm the holding of the Bankruptcy Court and will find the post-petition transfers were not authorized by the Customer Programs Order.

For the foregoing reasons, the Court will affirm the June 23, 2014, Order and Judgment of the Bankruptcy Court. An appropriate order follows.

BY THE COURT:

/s/ Juan R. Sánchez
Juan R. Sánchez, J.

---

thus, there is no evidence that the Vice President approved the transfers in reliance on the Customers Programs Order. Trial Tr. 73-74, May 19, 2014.